# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY DON EVANS, | Civil No.   07cv0791-JM (BLM) |
| Petitioner, | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| V.M. ALMAGER, Warden, et al., | |
| Respondents. | |

This Report and Recommendation is submitted to United States District Judge Jeffrey T. Miller pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

Terry Don Evans (hereinafter "Petitioner"), is a state prisoner proceeding pro se and in forma pauperis with a First Amended Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Doc. No. 26.)  Petitioner challenges his San Diego County Superior Court conviction on two counts of bank robbery, and his resultant sentence of 62 years-to-life in state prison, alleging: (1) prejudicial evidentiary rulings, ineffective assistance of counsel and prosecutorial misconduct; (2) insufficiency of the evidence; and (3) pre-charging

delay, discriminatory prosecution, suggestive identification procedures, failure to disclose exculpatory and impeachment evidence, suborning of perjury, conflict of interest by, and ineffective assistance of, defense counsel, admission of his prior convictions while incompetent, and outrageous government conduct.  (First Amended Petition ["FAP"] at 6.1-8.29.)

Respondent filed an Answer to the First Amended Petition, accompanied by a Memorandum of Points and Authorities in support thereof, and has lodged portions of the state court record.  (Doc. No. 34.)  Respondent contends that habeas relief is unavailable with respect to claims one and two because the adjudication of the claims by the state court was objectively reasonable.  (Memorandum of Points and Authorities in Support of Answer ["Ans. Mem."] at 7-18.)  Respondent contends that Petitioner has failed to exhaust his state court remedies with respect to claim three, but argues that habeas relief should be denied notwithstanding the failure to exhaust because the claim is without merit.  (Id. at 18-23.)  Petitioner filed a Traverse.  (Doc. No. 40.)

## II.

## STATE PROCEEDINGS

In a two-count Information filed in the San Diego County Superior Court on October 8, 2003, Petitioner and his co-defendant Richard Simpson were charged with two counts of robbery in violation of Cal. Penal Code section 211.  (Lodgment No. 1, Clerk's Transcript ["CT"] at 1-2.) The Information alleged as sentencing enhancements that Petitioner had suffered two prior serious felony convictions which constituted "strikes" under California's Three Strikes law, and had served two prior prison terms.  (CT 3-4.)

Petitioner's co-defendant pled guilty to one count of robbery prior to trial, and on April 28, 2004, a jury found Petitioner guilty of two counts of robbery.  (CT 228-29.)  Petitioner admitted the truth of the sentence enhancement allegations.  (CT 292.)  On May 26, 2004, he was sentenced to a state prison term of 62 years-to-life, consisting of consecutive terms of twenty-five years-to-life for each of the two robbery counts, imposed pursuant to the Three Strikes law, a consecutive five-year enhancement for each of the two prior serious felony

convictions, and a consecutive one-year enhancement for each of the two prior prison terms. (CT 295.)

Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One, presenting claims one and two as presented in the federal Petition. (Lodgment Nos. 3-4.)  The appellate court, in an unpublished opinion, affirmed in all respects. (Lodgment No. 5, People v. Evans, D044423, slip op. (Cal.Ct.App. Oct. 18, 2005).)  Petitioner thereafter filed a petition for review in the state supreme court raising the same claims. (Lodgment No. 6.)  The petition was summarily denied without citation of authority.  (Lodgment No. 7.)  Petitioner presented claim three to the California Supreme Court in a habeas petition. (FAP Ex. 4 at 4.12-4.30.)  The California Supreme Court denied that petition in an order which stated in full: "The petition for writ of habeas corpus is denied.  (See *In re Swain* (1949) 34 Cal.2d 300, 304; *People v. Duvall* (1995) 9 Cal.4th 464, 474.)"  (FAP Ex. 1, doc. A.)

**III.**

**<u>UNDERLYING FACTS</u>**

Ruth Sintay testified that on Saturday, February 15, 2003, she was working as a supervisor at the Downey Savings and Loan in Encinitas, California.  (Lodgment No. 2, Reporter's Tr. ["RT"] at 108.)  The branch is rather small and is patronized mostly by regular customers, with very few strangers. (RT 108-09.)  About 12:45 p.m., fifteen minutes before the bank closed for the day, Sintay was doing paperwork about ten feet behind the teller windows when she looked up and made eye contact with a six-foot tall black male, whom she identified in court as Petitioner, who was standing at the window of a teller named Beverly Hauck.  (RT 109-10, 117-18.)  Sintay went back to her paperwork, and a few moments later Hauck turned to her and said she had been robbed.  (RT 109-10.)  Hauck was crying and shaking, and appeared pale and scared.  (RT 110.)

Still photographs and a videotape from the bank security cameras, which depicted the robber walking into the bank and standing in line at Hauck's teller station, were shown to the jury. (RT 112-14, 117-18.)  The robber was wearing a short-sleeved shirt, and his arms from the elbow to the hands were visible in the photographs.  (RT 127, 129.)  Sintay said she was asked

by the police on the day of the robbery if the robber had any identifying scars or tattoos, and said no. (RT 123.)  She was contacted by the FBI several months after the robbery and shown a photographic lineup containing six photographs, known as a six-pack, and at that time she identified the man depicted in photograph number one as the robber. (RT 115, 124, 126)  The parties stipulated that Petitioner's photograph was number one in the six-pack lineup. (RT 116.)

Sintay testified on cross-examination that the five other men in the six-pack lineup did not look similar to Petitioner. (RT 124-26.)  She also said that Petitioner appeared to have gained some weight between the robbery and trial. (RT 127.) Sintay testified that she and seven other witnesses came to court for a preliminary hearing on November 3, 2003, about nine months after the robbery and about five months before trial. (RT 119-20.)  She was seated in the back of the courtroom for five minutes on that occasion, did not testify, and was told to come back at a future date. (RT 120-21.) Sintay said that although she saw only the back of Petitioner's head during the preliminary hearing, she told the prosecutor immediately after the hearing that Petitioner was the robber and that he appeared to have gained some weight since the robbery. (RT 126-28.)

Daniel Wells testified that he was in the Downey Savings and Loan at 12:45 p.m. on February 15, 2003.  (RT 132.)  He is a regular customer and was at the bank to exchange approximately three dollars in pennies into currency. (RT 133.)  As Wells was counting the pennies at the window, the teller asked him to step aside so she could help the next customer in line. (Id.) Wells described the man in line behind him as a black male, about five-feet seven or eight inches tall, weighing approximately 185 to 190 pounds, wearing a blue shirt and white tennis shoes, with a large, shaven head. (RT 133.)  Wells said he had seen the same man in the parking lot a few minutes earlier sitting in the passenger seat of a white Honda or Toyota driven by an Hispanic male. (RT 134.)

Wells said he did not hear the exchange between the teller and the black male because he was focused on counting his change. (RT 135.) Wells finished counting his coins and moved back to the teller window. (Id.)  At that time he noticed the black male leaving the bank and saw that the teller was crying. (RT 135-36.)  He asked the teller if she had just been robbed and she

07cv0791

nodded yes, so Wells ran outside after the robber but did not see him.  (RT 136.)  Wells chose photograph number one, Petitioner's photograph, from a six-pack photographic lineup shown to him by the FBI about two months after the robbery, about a year before trial, and said he was sure at that time that Petitioner was the robber.  (RT 137, 140.)  At trial, however, Wells said that Petitioner appeared to be older and heavier than the robber, that he had a mustache whereas the robber was clean-shaven, and "did not seem to be" the robber.  (RT 139-40.)  He said that the people in the other five photographs in the photographic lineup did not look like the man depicted in photograph number one.  (RT 141.)  Wells said he attended the preliminary hearing but did not testify, and that he told the prosecutor after the preliminary hearing that he could not determine whether Petitioner was the robber because he only saw the back of Petitioner's head during the preliminary hearing.  (RT 141-43.)

Esperanza Rodmel testified that she was working as a bank teller at Downey Savings and Loan on February 15, 2003.  (RT 146.)  She saw a black male, whom she identified in court as Petitioner, enter the bank at about 12:45 p.m. and stand in a teller line.  (RT 146, 155.)  Rodmel was sitting at the new accounts desk and had a good view of Petitioner as he was standing in line.  (RT 151.)  She said she had a bad feeling about Petitioner and kept an eye on him.  (RT 151-52.)  After Petitioner left, Rodmel noticed that the teller, Beverly Hauck, appeared scared and looked like she was about to cry.  (RT 154.)

Romel described the robber to police on the day of the robbery as a black male, approximately five-feet eleven inches tall, stocky and bald.  (RT 157.)  She was shown a photographic lineup sometime after the robbery and chose the person in photograph number one, Petitioner, as the robber, and said she was very certain at that time that he was the robber.  (RT 154-55.)  Rodmel said none of the other five photographs in the photographic lineup looked like the person in photograph number one.  (RT 163-64.)  She also said that she had no difficulty in identifying Petitioner in court as the robber even though he had gained some weight since the robbery.  (RT 155.)  Rodmel said she attended a preliminary hearing with seven other witnesses, and that they were in the courtroom only a few minutes and did not testify, but merely stepped up to the entrance to the well and gave their names.  (RT 160-61.)  Petitioner was in the

courtroom on that occasion, and when she left the courtroom she was asked by a prosecution investigator if she recognized him as the robber.  (RT 160-62.)  She said that she did not see Petitioner's face at the preliminary hearing, and told the prosecution investigator if that was the robber he had gained some weight.  (RT 162.)

Richard Simpson testified that he was involved in two bank robberies, one at the Downey Savings and Loan on February 15, 2003, and one three days earlier at Citibank on February 12, 2003. (RT 171.)  Simpson said he was testifying because he had been subpoenaed to appear, and that he had not made any type of deal with the prosecution.  (RT 171, 180.)  He said he had already pled guilty to his role in the robberies, that he received a five-year suspended sentence but was required to serve one year in county jail, and that he had already served eight months of the jail term.  (RT 175-76, 181.)  He testified that he drove a white Honda Prelude during the robberies, and that Petitioner entered the banks on both occasions and committed the robberies. (RT 172.)  Simpson said that he had no idea that Petitioner intended to commit a robbery the first time he drove him to Citibank, and only found out when Petitioner came out of the bank and told Simpson to drive away because he had just robbed the bank.  (RT 172-73.)  After that robbery, Petitioner paid Simpson "a couple hundred bucks" for his participation.  (RT 174.)  Three days later, Petitioner asked Simpson to drive him to Downey Savings and Loan.  (RT 174.)  When they got there, Petitioner entered the bank and Simpson followed him in.  (RT 175.)  Simpson turned around and walked out of the bank shortly after walking in, and waited in the car.  (Id.) Petitioner came out about ten minutes later and told Simpson to hurry up and drive away.  (Id.) Simpson knew Petitioner was going to commit a robbery on that occasion, and said that Petitioner gave him "a couple hundred bucks" for that robbery.  (Id.)

Simpson identified himself as the man wearing a beanie in a photograph taken by a surveillance camera during the Citibank robbery, and identified Petitioner as the man shown in the surveillance video taken during both robberies.  (RT 176-77.)  He said that Petitioner had gained between fifty and sixty pounds since the robberies. (RT 184-85.)  On cross-examination, Simpson admitted he had prior felony convictions for possession of amphetamine with intent to distribute and reckless evading arrest, and that he had violated probation "a couple of times."

(RT 180.)  Simpson also admitted that he knows a drug dealer named Chaz who looks very much like Petitioner, but denied implicating Petitioner in order to protect Chaz.  (RT 183-84.)

Beverly Hauck testified that she was working as a bank teller at Downey Savings and Loan on February 15, 2003.  (RT 186-87.)  About 12:45 p.m., a customer named Wells was at her window counting pennies and she asked him to step aside so she could help the next person in line, whom she identified in court as Petitioner.  (RT 187-88.)  Petitioner stepped up to the window, opened a leather billfold and gave her a note demanding that she put $2,500 in the wallet without dye packs.  (RT 188.)  Hauck told Petitioner that she did not have that much money, whereupon Petitioner leaned forward and in a quiet but forceful voice replied: "Just give it to me."  (Id.)  Hauck said she was terrified, and pulled $479 out of her drawer, which was all the cash she had, set it on the counter, and lifted her drawer to show Petitioner it was empty.  (RT 189.)  Petitioner put the money in his wallet and walked out the door.  (RT 189.)  When Wells noticed she was crying, he asked her if she had just been robbed, and then left the bank to pursue Petitioner.  (RT 190.)  Hauck then followed procedure by closing her window, activating an alarm, quietly informing her supervisor, and writing notes about what had happened, which she was unable to do legibly as she was so upset.  (Id.)

Hauck identified Petitioner in court as the robber depicted on the security camera videotape.  (RT 191-93.)  About six months after the robbery she was shown a photographic lineup with six photographs, and she chose photograph number one, Petitioner's photograph, as the robber.  (RT 193, 196.)  She said the photographs of the other five men in the lineup did not look like Petitioner.  (RT 197.)  Hauck said she was very good with faces, and was confident in her identification of Petitioner both when she was shown the photographic lineup and in court. (RT 193-94.)  She described the robber to police on the day of the robbery as a black male in his mid-30s, between five-feet, ten-inches and six-feet tall, 220 pounds, with a shaved head and brown eyes.  (RT 196.)  She was asked by the police on the day of the robbery if the robber had any identifying scars or tattoos, and she told them she did not remember seeing any.  (Id.)  Hauck said she attended a preliminary hearing but merely recited her name and was excused.  (RT 198.)  She did not get a good look at the face of the man sitting at the defendant's place

during the preliminary hearing, and told the prosecutor afterwards that if he was the robber he had gained some weight.  (RT 199.)

Rudy Zamora, a San Diego County Sheriff's Detective assigned to investigate the two robberies, testified that he arrested Petitioner in October of 2003, about eight months after the robberies and six months before trial, and said that Petitioner had gained twenty to thirty pounds between then and the trial.  (RT 203-04, 206-07.)  The FBI initially investigated the case and conducted the photographic lineups in April and July of 2003, before deciding not to prosecute.  (RT 207.)  The FBI turned the case over to the San Diego County Sheriff's department in October of 2003, and Petitioner was immediately charged with both robberies.  (RT 209-10.)  Zamora was present at the preliminary hearing and said that the each of the witnesses merely stepped up to a podium to indicate to the court whether they would be available to testify at a future date, and were in a position such that they could see Petitioner's face only from the side.  (RT 204-05, 215.)  Zamora said he conducted interviews with the witnesses prior to the preliminary hearing, and at that time showed them their police statements and the six-pack photographic lineup which they had already been shown by the FBI, so that he could accurately testify at the preliminary hearing and their testimony would not be required.  (RT 212-15.)  He said he did not know why a handwriting analysis of the note recovered from the Citibank robbery was never conducted.  (RT 208.)

David Engblom testified that he was working as the branch manager of Citibank in Vista, California, on February 12, 2003.  (RT 221.)  At about 11:45 a.m. that day, Engblom was sitting at his desk talking to employee Nancy Tuininga, when a man, whom he identified in court as Petitioner, entered the bank and began looking at brochures as if he was interested in opening an account.  (RT 221-22, 229.)  Petitioner did not appear to be reading the brochures but was looking around the bank.  (RT 223.)  Engblom walked over to Petitioner, who was about fifteen feet from his desk, and asked if there was something he could help him with, to which Petitioner replied no.  (RT 222-23.)  Engblom went back to his desk and continued his conversation with Tuininga.  (RT 222.)  A short time later Petitioner walked past them and exited the bank.  (Id.)  As Petitioner left, Engblom asked him if he had found everything ok, and Petitioner replied yes

1   and that he did not need any further help.  (Id.)  Engblom had a bad feeling about Petitioner and

2   followed him out to the parking lot, but did not see him.  (RT 223.)

3          Petitioner came back inside the bank sometime later carrying a small black pouch, walked

4   past Engblom's desk, and went directly to a teller window.  (RT 223-24.)  Englbom activated

5   special heightened security cameras while Petitioner was speaking to teller Marc Tavano.  (RT

6   224.)  Petitioner walked away from the window, and Tavano indicated to Engblom that he had

7   been robbed.  (RT 225.)  Engblom walked outside and saw a white Honda Prelude driven by a

8   White male proceed rapidly through the parking lot, with the passenger seat reclined so far back

9   that he could not see the passenger.  (RT 225-26.)  Engblom identified Petitioner in court as the

10  robber shown on the photographs from the bank's security cameras, and said he chose

11  Petitioner's photograph from the six-pack photographic lineup he was shown by the FBI a

12  couple of months after the robbery.  (RT 226-28.)  Engblom said when he was first shown the

13  photographic lineup he was not one hundred percent sure that Petitioner was the robber, but after

14  seeing him in court at the preliminary hearing and at trial, he was now positive that Petitioner

15  was the robber.  (RT 232.)  He was not able to identify any tattoos or scars on Petitioner, and

16  said that Petitioner had gained about ten or twenty pounds between the robbery and trial.  (RT

17  234, 239.)  It was later determined that Petitioner took $1,540 from the bank.  (RT 236.)

18         Marc Tavano testified that he was working as a bank teller at Citibank on February 12,

19  2003, at about 11:45 a.m., when a man whom Tavano identified in court as Petitioner walked

20  up to his teller window.  (RT 240-41, 250.)  Tavano said that he had noticed Petitioner earlier

21  that day when he had entered the bank, looked at some brochures and left.  (RT 241-42.)

22  Petitioner walked up to the teller window rambling into a cell phone, and put a note and a black

23  bag on the counter.  (RT 242.)  Tavano put most of the money that was in his drawer into the

24  black bag as directed by the note.  (RT 244.)  Petitioner grabbed the bag and walked out quickly.

25  (RT 245.)  Tavano activated an alarm and then wrote down what had happened.  (Id.)

26         Tavano described the robber to the police immediately after the robbery as a stocky black

27  male between six-feet and six-feet, two-inches tall, weighing about 200 pounds.  (RT 254.)  He

28  did not see any scars or tattoos on the robber "because everything was pretty much covered."

(RT 254.)  Tavano said he was not able to identify the robber from the six-pack photographic lineup he was shown several months after the robbery, but said that after he saw Petitioner at the preliminary hearing and at trial he was sure he was the robber.  (RT 249-50.)  He said Petitioner tried to avoid letting the witnesses see his face at the preliminary hearing by staring straight ahead and refusing to look at them.  (RT 253.)

April Sylvester testified that she was working as a teller at Citibank on February 12, 2002, and was present when the bank was robbed.  (RT 258.)  She was cleaning under Marc Tavano's teller window when a man, whom she identified in court as Petitioner, approached her window.  (RT 258, 263.)  She looked up and said hello to Petitioner, who then moved to Tavano's window when Tavano offered to help him.  (RT 258.)  Petitioner was talking on a phone and did not acknowledge Sylvester, but she got a good look at him and recognized him from when he came in earlier that day and looked at some brochures.  (RT 259.)

Petitioner left the bank and Tavano told Sylvester that he had been robbed.  (RT 261.)  Several months later police showed Sylvester a six-pack photographic lineup, from which she chose photograph number one, Petitioner's photograph, and said she was sure he was the robber.  (RT 261-62, 265.)  She said she only saw the side of Petitioner's face during the preliminary hearing, but was able to recognize him at that time as the robber.  (RT 263.)  She described the robber to the police at the time of the robbery as a black male, 220 pounds, salt-and-pepper gray hair, clean shaven, wearing a hat and jacket.  (RT 264.)

Allan Wicks testified that he knew Petitioner in a professional capacity during the time period of February 2003, that they saw each other in an office setting two or three times a month during that period, and he was familiar with how Petitioner looked during that time.  (RT 269.)  Wicks was in fact Petitioner's parole officer, although the jury was prevented from learning that fact due to a pre-trial ruling.  (RT 70-72.)  Wicks identified Petitioner as the robber seen on the security camera photographs and videotapes from the bank robberies.  (RT 270-71.)  Wicks described Petitioner's appearance during that time frame as a black male, between five-feet ten-inches and six-feet tall, approximately 180 to 200 pounds, with a dark shadow of a beard that appeared at most times.  (RT 272.)  Wicks said he was not aware of any distinguishing tattoos

or scars on Petitioner.  (Id.)  Petitioner was asked to show his arms, and Wicks said he could see some marks on Petitioner's arms which appeared to be darker pigment than his skin.  (Id.) Wicks then stepped down from the witness box and examined Petitioner more closely, and described to the jury a large scar on Petitioner's right forearm, two large scars on his left forearm, and a scar on his right knuckle.  (RT 272-73.)

Nancy Tuininga testified that she was working at Citibank in February 12, 2003, and was speaking to Dave Englbom, the branch manager, about 11:45 a.m. that day, when a man whom she identified in court as Petitioner briefly nodded to her as he entered the bank.  (RT 280-81, 289.)  Engblom told Tuininga that "something's not right," and they both observed Petitioner look at brochures while at the same time looking around the bank.  (RT 281.)  Petitioner left the bank after several minutes.  (Id.)  She described him as a black male, five-feet, eight-inches tall, wearing a black sweater and dress pants.  (Id.)

Tuininga continued her conversation with Engblom, and sometime later noticed that Petitioner had reentered the bank.  (RT 282.)  Tuininga followed Petitioner, who walked up to Tavano's teller window, and she stood beside him attempting to monitor the transaction.  (Id.) She was less than two feet away from Petitioner and was staring at him, attempting to initiate eye contact, and although she was sure that Petitioner was aware that she was staring, he did not turn or make eye contact with her.  (RT 283.)  He produced a small black pouch and slid it toward Tavano.  (RT 282.)  Tavano did not look up and did not make eye contact with Tuininga, but was red in the face.  (RT 284.)  Petitioner was wearing a jacket over the sweater he was wearing when he first entered the bank.  (RT 283.)  Tuininga saw Tavano put money into the black pouch, and saw Petitioner pick up the pouch, zip it closed, put his head down and walk quickly out the door without making eye contact.  (RT 283-84.)  She turned to Tavano and asked him if he had just been robbed, and he said yes.  (RT 284.)  She looked out the window and saw a man with a lighter complexion drive away with the passenger seat laid back so far that she could not see if anyone was in that seat.  (RT 287-88.)

Tuininga identified Petitioner in court as the robber depicted in the security camera photographs.  (RT 284-87.)  She said she was shown a six-pack photographic lineup by the FBI

sometime after the robbery and chose the person in photograph number one, Petitioner, as the robber.  (RT 288.)   Tuininga said she did not get a look at Petitioner's face during the preliminary hearing, but recognized him at that time as the man she chose from the photographic lineup.  (RT 288, 294-95.)  She did not recall seeing any tattoos or scars on Petitioner at the time of the robbery.  (RT 290.)

The parties stipulated that law enforcement personnel lifted five fingerprints from the west door of Downey Savings and Loan, two of which were of sufficient quality to compare to Petitioner's fingerprints, and that neither belonged to Petitioner.  (RT 295.)  The people rested, and the trial was adjourned an hour early so Petitioner could have overnight to consult with his attorneys and decide whether he was going to testify.  (RT 274-75, 294, 450.)

When the trial resumed the next morning, defense counsel indicated that Petitioner had decided not to testify.  (RT 451.)  Defense counsel had reserved her opening statement, and indicated that she intended to give an opening statement which would focus on the fact that Petitioner has obvious scars on his arms which were not seen by any of the witnesses, and that the Downey Savings robber was wearing a short-sleeved shirt, but the scars on Petitioner's arms did not match the scars on the arms of the robber seen on the videotape and still photographs from the Downey Savings robbery.  (RT 451.)  Counsel indicated that she would then have Petitioner show his arms to the jury and rest their case.  (Id.)  The prosecutor objected that there was no evidence that Petitioner had the scars at the time of the robberies, and reminded the court that Petitioner's parole officer had testified that he did not recall seeing any marks on Petitioner's arms around the time of the robberies.  (RT 454.)  The trial judge noted that although there is a visible mark on the robber's arm in the surveillance videotape and photographs, the photographs are of such poor quality that it was unclear whether they are the same marks as on Petitioner's arms, but that it was an issue for the jury to decide.  (RT 453, 456.)

The trial judge ruled that the defense could not argue that Petitioner had the scars at the time of the robbery because there was no evidence adduced at trial to that extent, and indicated that he was not pleased that the defense had waited so late to raise the issue.  (RT 454, 459-63.)  The judge ruled that if Petitioner took the stand to testify, even as to the limited issue of when

and how he got the marks on his arms, he would be subject to impeachment with his four prior convictions, two for felony robbery in 1983 and 1986, one for felony auto theft in 1986, and one for misdemeanor petty theft in 1992. (RT 306-07, 453, 568-71.) The judge indicated he would allow the prosecutor to introduce booking photographs or parole records if they showed that Petitioner did not have the marks on his arms prior to the robberies, but the prosecutor indicated to the court that all such records in his possession were inconclusive. (RT 461-62.) The judge noted that because the issue had just been raised that morning, the parties had not had sufficient time to procure records on the subject. (RT 463.)

The defense took the position that the marks were from Petitioner's childhood and were obviously the type of marks which the jurors would recognize as old, permanent scars, and therefore it had never occurred to them to subpoena medical records which would show the date he obtained the scars. (RT 463-64.) The trial judge indicated he would not allow argument to the jury regarding when the scars formed or whether they were old, permanent marks, because it was not supported by any evidence in the record. (RT 464.) The defense indicated that the scar on the knuckle came from a 1995 injury, that the scar on the forearm came from a 1992 injury, that medical records were available to establish those injuries, and requested a 24 hour continuance in order to procure medical records. (RT 463-65.) The trial judge denied the request for a continuance, indicating that he had already given the defense the previous afternoon to consider whether Petitioner would testify, but stated that he would allow the defense to show Petitioner's arms to the jury and argue that the marks appear to be whatever they reasonably appear to be, to which defense counsel replied: "That's all I'm asking for." (RT 465.)

The parties then had a twenty minute discussion off the record regarding a possible stipulation, and in order to look into whether there were any booking records relating to the marks on Petitioner's arms. (RT 501.) There was a parole record slightly pre-dating the robberies which indicated scars on Petitioner's right wrist and left arm, and the prosecutor offered to stipulate to the contents of that record. (Id.) The defense declined the prosecutor's offer because it would implicate Petitioner's custodial status, and because it might lead the jury to incorrectly conclude that the other two marks, which were documented on a prison record

1  which was not in evidence but which also predated the robberies, were not present on

2  Petitioner's arms at the time of the robberies.  (RT 466, 502.)

3      Defense counsel presented an opening statement which is not transcribed, and Petitioner

4  then stood ten or twelve feet in front of the jury and showed them his arms and hands.  (RT

5  503–04.)  The defense rested and the prosecution offered no rebuttal.  (RT 504.)  The attorneys

6  presented closing arguments (RT 505-56), which the appellate court summarized as follows:

> In closing argument, defense counsel claimed Simpson was lying to protect his friend and drug connection Chaz who looked like [Petitioner]; the photographic lineup, the video photos, and the in court identifications were all tainted as repetitive and suggestive; noted all the inconsistencies in the identification evidence; and stressed the fact there had been no evidence from any of the witnesses about the marks on [Petitioner's] arms.
>
> In response, the prosecutor noted all the bank witnesses except one had picked [Petitioner's] photo out of the six-pack photo lineup as the robber, the defense had not made any effort to secure the attendance of Chaz, and the defense was making too much of the scars on [Petitioner's] arms.  The prosecutor asked the jury to carefully look at the photographs from the bank's security video cameras which showed [Petitioner] was wearing a long-sleeved shirt during the Citibank robbery and several photos from the Downey Savings robbery which revealed the robber had discoloration on the right arm in the same spot as the marks on [Petitioner's] arms.

16  (Lodgment No. 5, <u>People v. Evans</u>, No. D044423, slip op. at 12-13.)

17      While the jury was deliberating, and outside their presence, Petitioner admitted that he

18  had suffered two prior serious felony convictions for robbery in 1983 and 1986, and had served

19  prison terms following a felony conviction for auto theft in 1986 and a felony drug conviction

20  in 1998.  (RT 568-71.)  After deliberating about five hours over two days, during which they

21  requested and received a magnifying glass, the jury found Petitioner guilty of two counts of

22  robbery.  (CT 291-94.)  Petitioner was sentenced to two consecutive terms of twenty-five years

23  to life under the Three Strikes law, one for each of the robbery counts, received two consecutive

24  five-year enhancements for each of the serious prior felony convictions, and received two

25  consecutive one-year enhancements for each of the prison priors, resulting in a total sentence of

26  62 years-to-life.  (RT 666.)

27  ///

28  ///

IV.

**PETITIONER'S CLAIMS**

Petitioner asserts three claims, two of which include numerous alleged errors.  In his first claim, Petitioner alleges that his rights under the Fifth, Sixth and Fourteenth Amendments were violated by: (a) the admission of testimony of his parole officer identifying Petitioner as the man depicted on the videotapes robbing the banks, and his testimony that Petitioner did not have any scars on his arms at the time of the robberies; (b) defense counsel's failure to present evidence refuting the parole officer's testimony, including failing to obtain medical records showing that Petitioner had the scars at the time of the robbery, which amounted to ineffective assistance; (c) the prosecutor's refusal to stipulate to the date Petitioner obtained the scars; and (d) the trial court's rulings in regard to the admission of evidence regarding the scars.  (First Amended Petition ["FAP"] at 6.1-6.13.)  In his second claim, Petitioner asserts that his rights under the Fifth, Sixth and Fourteenth Amendments were violated because insufficient evidence exists to support the convictions.  (FAP at 7.1-7.3.)  In his third and final claim, Petitioner alleges that his rights to due process and equal protection under the Fifth, Sixth and Fourteenth Amendments were violated by: (a) the pre-accusation delay; (b) prosecutorial misconduct in connection to the preliminary hearing which resulted in impermissibly suggestive identification procedures; (c) the failure of the prosecutor to disclose exculpatory and impeachment evidence; (d) suborning of perjury by the prosecution; (e) conflict of interest by, and ineffective assistance of, defense counsel; (f) the admission of the truth of prior conviction and prison term sentence enhancement allegations while incompetent; (g) discriminatory prosecution; and (h) general improprieties and outrageous government conduct during the state proceedings.  (FAP at 8.1-8.29.)

V.

**DISCUSSION**

For the following reasons, the Court finds that Petitioner's claims do not merit habeas relief.  The Court therefore recommends that judgment be entered denying the Petition.

**A.    Standard of Review.**

Title 28, United States Code, § 2254(a), sets forth the following scope of review:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States</u>.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

Under 28 U.S.C. § 2254(d):

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (1)-(2) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." <u>Id.</u> at 407. An unreasonable application may also be found, "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u>

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

///

1  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United

2  States Supreme] Court's decisions." <u>Williams</u>, 529 U.S. at 412.

3  Habeas relief is also available if the state court's adjudication of a claim "resulted in a

4  decision that was based on an unreasonable determination of the facts in light of the evidence

5  presented in state court."  28 U.S.C.A. § 2254(d)(2) (West 2006).  In order to satisfy this

6  provision, a federal habeas petitioner must demonstrate that the factual findings upon which the

7  state court's adjudication of his claims rest, assuming they rest on a factual determination, are

8  objectively unreasonable.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

9  **B.    Petitioner is not entitled to habeas relief as to claim one.**

10  Petitioner first claims that his right to due process and to effective assistance of counsel

11  under the Fifth, Sixth and Fourteenth Amendments were violated by: (a) the testimony of his

12  parole officer identifying Petitioner as the man on seen the videotapes robbing the banks, and

13  that Petitioner did not have any scars at the time of the robberies; (b) defense counsel's failure

14  to present evidence refuting the parole officer's testimony, including failing to obtain medical

15  records showing that Petitioner had the scars at the time of the robbery, which amounted to

16  ineffective assistance of counsel; (c) the prosecutor's refusal to stipulate to the date Petitioner

17  obtained the scars; and (d) the trial court's rulings regarding permitting the introduction of that

18  evidence and denying the defense request for a continuance in order to obtain records regarding

19  the scars.  (FAP at 6.1-6.13.)  Respondent contends that the adjudication of this claim by the

20  state appellate court was objectively reasonable.  (Ans. Mem. at 7-16.)

21  Petitioner presented claim one to the state supreme court in the petition for review.

22  (Lodgment No. 2 at 11-21.)  That petition was denied by an order which stated in full: "Petition

23  for review DENIED. Chin, J., was absent and did not participate."  (Lodgment No. 7.)  In <u>Ylst</u>

24  <u>v. Nunnemaker</u>, 501 U.S. 797, 804 (1991), the Court adopted a presumption which gives no

25  effect to unexplained state court orders but "looks through" them to the last reasoned state court

26  decision.  Claim one was presented to the appellate court in the same manner as it was presented

27  to the state supreme court.  (Lodgment No. 3 at 12-20.)  The appellate court denied the claim in

28  a reasoned opinion.  (Lodgment No. 5, <u>People v. Evans</u>, No. D044423, slip op. at 20–24.)

The Court will therefore look through the silent denial by the state supreme court to the appellate court opinion. With respect to the admission of the testimony of Petitioner's parole officer, the appellate court stated:

> In limine, the prosecutor brought a motion to present the testimony of Wicks, Evans's parole agent at the time of the robberies, on the issue of identity. Essentially, Wicks would look at the photographs taken from the bank's video cameras and say that in his opinion they depict Evans. Trial counsel objected on grounds it would "allow a parole agent to render a legal –, actually a factual conclusion. That's up to the jury to decide whether Mr. Evans is the person shown in the photos." Counsel also thought Wick's testimony would tend "to bolster the more skeptical opinions of the . . . bank people who were not sure of their identification" and offered to stipulate that the photograph in the six-pack lineup was Evans. The court stated it would not allow the jury to know Wicks was a state agent, but would permit him to testify about knowing Evans in a professional capacity during a certain time and that after looking at the photograph it was his opinion such was Evans.

> When the prosecutor clarified he did not want Wicks to identify the six-pack, but rather the video photographs, defense counsel said she "absolutely objected to that." The court deferred ruling, stating it wanted to "think about that one." When proceedings resumed the next week, the prosecutor again inquired whether Wicks "could testify to recogniz(ing) the defendant in the photographs." Defense counsel again objected on grounds Wicks had not been at the banks on the days they were robbed, the testimony would be prejudicial and it was for the jury to decide the issue of identity. Counsel also believed that Wicks did not really know Evans well and "(f)or all we know, he is wrong too."

> The court ruled the prosecutor was entitled to have Wicks testify and stated, after doing a balancing under Evidence Code section 352, "the fact that it's bad evidence for the defense shouldn't keep it out. So . . . it's a legal question, and . . . it's okay."

> On appeal, Evans contends the trial court prejudicially abused its discretion in "allowing incompetent evidence of the identity of the alleged robber via his parole officer's identification of him as the man in the bank videotapes." We disagree.

> Evidence Code section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: (¶) (a) Rationally based on the perception of the witness; and (¶) (b) Helpful to a clear understanding of his testimony." In addition, lay opinion testimony concerning the identity of a person portrayed in a surveillance camera photograph of a robbery has been held to be admissible where the witness has "personal knowledge of the defendant's appearance at or before the time the photo was taken(,) and (his) testimony aid(s) the trier of fact in determining the crucial identity issue." (*People v. Mixon* (1982) 129 Cal.App.3d 118, 128 (*Mixon*).) This is true even in the case of law enforcement personnel such as police and parole officers "where foundational facts supporting the officers' knowledge are established outside the jury's presence. (Citation.)" (*Id*. at p. 133.)

> Generally, the admission of such lay opinion testimony is within the discretion of the trial court and will not be disturbed absent a clear abuse of that

discretion.  (*Mixon*, *supra*, 129 Cal.App.3d at p. 127.)  Where, as here, the court exercises its discretion to determine whether the prejudicial effect of the officer's testimony is substantially outweighed by its probative value, we will not reverse a conviction based on such discretionary ruling "'"except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice."' (Citation.)" (*People v. Jones* (1998) 17 Cal.4th 279, 304.)

Here, Wicks's personal knowledge of Evans's appearance at or before the time the photo was taken was established by the prosecutor's offer of proof outside the jury's presence.  Wicks had been Evans's parole officer between November 2002 and February 2003, the month of the robberies.  Wicks met with Evans in his office two or three times a month for about 20 minutes each time. Defense counsel did not challenge these representations or ask for an evidentiary hearing on the matter.

Then, similar to the situation in *Mixon*, because the photographs of at least the Citibank videotape were not of the highest quality to give a clear depiction of the robber, Wicks's testimony would aid the jury's identification of the man depicted in those video photographs.  (*Mixon*, *supra*, 129 Cal.App.3d at p. 131.). Also, as in *Mixon*, Evans had altered his appearance since the time of the robbery, having gained extra weight and grown a moustache between that time and trial. Wicks's testimony showing knowledge of Evans's appearance at the time of the robberies could thus assist the jury regarding such changes.  (*Id.* at pp. 131-132.)

Moreover, because the foundational facts supporting Wicks's knowledge of Evans's features was established outside the jury's presence and Wicks's identity as Evans's parole officer was not to be mentioned before the jury, these procedures essentially dissipated the danger of any prejudice inherent when a jury knows the person testifying is involved with law enforcement.  (*Mixon*, *supra*, 129 Cal.App.3d at pp. 132-133.)  The potential for prejudice was further diminished by Wicks's testimony itself in this case.  Wicks could not be positive Evans was the person depicted in the Citibank robbery video photographs, and he could not remember whether Evans had any scars at the time he had his meetings with him. Contrary to Evans's claim that Wicks's testimony about the marks on his arm were definite, authoritative statements he had no scars on his arms at the time of the robberies, the record reveals otherwise.  [¶]  In sum, on this record, we cannot find the trial court abused its discretion in allowing Wicks to testify.

(Lodgment No. 5, <u>People v. Evans</u>, No. D044423, slip op. at 20–24.)

Petitioner argues that his federal due process rights were violated by the testimony of his

parole officer, and that the appellate court's determination to the contrary was unreasonable.

(FAP at 6.1-6.13; Traverse at 3-7.)  Clearly established federal law provides, however, that

claims alleging violations of state law do not generally give rise to claims cognizable on federal

habeas.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) (holding that federal habeas relief

does not lie for errors of state law).  Nevertheless, the Ninth Circuit has indicated that state laws

can give rise to liberty interests cognizable on federal habeas, and that a federal due process

1   violation can arise from arbitrary rulings.  See Fetterly v. Paskett, 997 F.2d 1295, 1300 (9th Cir.

2   1993) ("[T]he failure of a state to abide by its own statutory commands may implicate a liberty

3   interest protected by the Fourteenth Amendment against arbitrary deprivation by a state, [and]

4   Ninth Circuit precedent generally supports this proposition."), citing Ballard v. Estelle, 937 F.2d

5   453 (9th Cir. 1991).

6          Here, the appellate court found that the trial court did not apply state law incorrectly or

7   arbitrarily.  That finding is supported by the record.  There was evidence at the trial that

8   Petitioner's physical appearance had changed between the robberies and the trial.  The testimony

9   of Wicks, who was familiar with Petitioner's physical appearance at the time of the robberies,

10  was relevant to the issue of identity.  As quoted above, the appellate court applied state law

11  carefully and thoroughly.  Because Petitioner has not demonstrated either that the trial judge

12  acted in an arbitrary manner with respect to allowing the testimony of Petitioner's parole officer,

13  or that the decision of the appellate court rejecting his claim was arbitrary, he has failed to

14  demonstrate a due process violation.  Fetterly, 997 F.2d at 1300.

15         The Ninth Circuit has also held that a federal habeas petitioner may establish a due

16  process violation by showing that an evidentiary ruling was so prejudicial that it rendered his

17  trial fundamentally unfair.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); Jammal

18  v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  The appellate court correctly pointed out

19  that Petitioner had misread the record when he contended that his parole officer testified that

20  Petitioner did not have the marks on his hands and arms at the time of the robberies.  Rather,

21  when asked by defense counsel whether Petitioner had any distinguishing tattoos or scars on his

22  body that Wicks "could see from your interviews with him," he answered: "I don't recall any,

23  no."  (RT 272.)  In light of the fact that the jury was informed only that Wicks knew Petitioner

24  in a professional capacity and met with him for less than an hour two or three times a month, it

25  is not obvious that the jury would infer that Petitioner's arms were visible during those meetings.

26  It is possible that the jury would infer that Wicks did not remember seeing any marks on

27  Petitioner's arms because Petitioner's arms were covered during their "professional" meetings,

28  or that Wicks simply did not notice the marks.  This conclusion is further bolstered by the fact

1  that Wicks could not clearly see the marks on Petitioner's arms from his seat in the witness box,

2  but had to approach Petitioner in order to describe the marks to the jury.  (RT 272-73.)

3  Petitioner has failed to demonstrate fundamental unfairness arising from the testimony

4  of Wicks, who knew Petitioner at the time of the robberies and was aware of his physical

5  appearance at that time, and who testified that it was Petitioner who was depicted on the

6  videotapes and security photographs taken during the robberies, and who testified as to the

7  change in Petitioner's physical appearance since the robberies.  This is particularly true in light

8  of the fact that the jury was able to see the photographs and videotapes firsthand and decide for

9  themselves whether or not the robber was Petitioner, and in light of the fact that many of the

10  eyewitnesses to the robberies, including the person who drove Petitioner to and from the

11  robberies, also identified the man on the videotape and security photographs as Petitioner.

12  Petitioner's contention that the in-court identification by Wicks carried extra weight because

13  Wicks was a government agent is without merit because the jury did not know anything about

14  Wicks' profession.  (RT 269-74.)  Thus, with respect to the aspect of claim one alleging a due

15  process violation arising from the admission of Wicks' testimony, the adjudication of the claim

16  by the appellate court was neither contrary to, nor involved an unreasonable application of,

17  clearly established federal law, and was not based on an unreasonable determination of the facts.

18  Petitioner next contends that he received ineffective assistance of counsel because defense

19  counsel failed to present evidence refuting Wicks' testimony, including medical records and

20  other documents showing that Petitioner had the marks on his arms at the time of the robbery,

21  and argues that there was no tactical advantage to that failure.  (FAP at 6.5-6.11; Traverse at 5-

22  7.)  Respondent contends that it was objectively reasonable for the state court to find that defense

23  counsel had a valid tactical reason for not procuring the medical records or putting on the

24  available evidence of the scars, and that the record supports the state court's finding that it was

25  not reasonably probable that Petitioner would have obtained a more favorable outcome had the

26  evidence been presented.  (Ans. Mem. at 15-16.)

27  The clearly established United States Supreme Court law governing ineffective assistance

28  of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  See Baylor v.

1   <u>Estelle</u>, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that <u>Strickland</u> "has long been clearly

2   established federal law determined by the Supreme Court of the United States"). For ineffective

3   assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things.

4   First, he must show that counsel's performance was deficient. <u>Strickland</u>, 466 U.S. at 687.

5   "This requires showing that counsel made errors so serious that counsel was not functioning as

6   the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> Second, he must show

7   counsel's deficient performance prejudiced the defense. <u>Id.</u> This requires showing that

8   counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is

9   reliable." <u>Id.</u> To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable

10  probability that the result of the proceeding would have been different absent the error.

11  <u>Williams</u>, 529 U.S. at 406; <u>Strickland</u>, 466 U.S. at 694 ("The result of a proceeding can be

12  rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot

13  be shown by a preponderance of the evidence to have determined the outcome.") The prejudice

14  inquiry is to be considered in light of the strength of the prosecution's case. <u>Luna v. Cambra</u>,

15  306 F.3d 954, 966 (9th Cir.), <u>amended</u>, 311 F.3d 928 (9th Cir. 2002).

16      The appellate court denied this aspect of claim one, stating:

17          Nor can we conclude trial counsel's failure to secure Evans's medical
        records showing the age of the marks on his arms denied him effective assistance
18      of counsel. A defendant making a claim of ineffective assistance of counsel has
        the burden of showing that his trial counsel's performance was both professionally
19      deficient and that there is a "reasonable probability that, but for counsel's
        unprofessional errors, the result of the proceeding would have been different."
20      (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma* ).) In other words,
        Evans must show that his counsel's deficient performance rendered the result of
21      the trial unreliable or the proceeding fundamentally unfair before his claim of
        ineffective assistance of counsel will have merit. (*Lockhart v. Fretwell* (1993) 506
22      U.S. 364 (*Fretwell*).) On this record, he cannot do so.

23          Although reasonable minds may differ as to whether trial counsel's
        performance was deficient for failing to obtain Evans's medical records before
24      trial, the record reflects counsel provided a tactical reason for not doing so.
        Counsel was fully prepared to present a defense which included showing the
25      defendant's arms, and then argue misidentification due to no eyewitness having
        noticed such scars and the numerous other discrepancies in their testimony.
26      Counsel only requested a continuance to obtain the medical records when the
        court ruled counsel could not argue that the marks were definitely old scars, but
27      could only argue they appeared to be old. Counsel explained it had not occurred
        to the defense to subpoena the medical records because they thought they were
28      obviously old scars. Counsel then made a deliberate decision to just argue the
        appearance of the marks and not have Evans testify or stipulate to references to

some of the scars in a parole report in order to keep Evans's prior custody and criminal history from the jury. The record thus discloses rational decisions on counsel's part in providing a defense for Evans. Under such circumstances, the record does not "affirmatively reveal( ) that counsel had no rational tactical purpose for an allegedly incompetent act or omission." (*People v. Garrison* (1989) 47 Cal.3d 746, 783.)

Moreover, even assuming counsel's omission was not a rational tactical decision, Evans has failed to show that there is a "'reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (*Ledesma, supra*, 43 Cal.3d at pp. 216-218.) Evans was positively identified in court by all eyewitnesses in the banks except for one. His former roommate and codefendant Simpson also testified he drove Evans to and from both banks, Evans had told him he had robbed the banks, and Evans had paid him "a couple hundred dollars" on each occasion. The marks on Evans's arms were shown to the jury and Wicks described that they looked like scars. The prosecutor pointed out in closing that the robber was wearing long sleeves during the Citibank robbery and that several of the photos taken from the Downey Savings robbery showed the robber had certain marks on his arms. Trial counsel argued all the inconsistencies in the eyewitness evidence, the failure of any of the witnesses to notice the marks on Evans's arms during the robberies, and discredited Simpson's testimony as protecting his drug source who looked like Evans.

Based on the totality of the evidence and the arguments presented the jury, we cannot find there is a reasonable likelihood Evans would have received a different outcome had his medical records been presented. (*Ledesma, supra*, 43 Cal.3d at pp. 216-218.) Because we conclude Evans has not met his burden of showing his counsel's performance rendered the result of his trial unreliable or fundamentally unfair (*Fretwell, supra*, 506 U.S. 364; *Ledesma, supra*, 43 Cal.3d at pp. 216-218), his claim of ineffective assistance of counsel fails.

(Lodgment No. 5, <u>People v. Evans</u>, No. D044423, slip op. at 18-20.)

Although, as the appellate court pointed out, reasonable minds could differ regarding whether counsel was deficient for failing to secure medical records showing that the marks on Petitioner's arms predated the robberies, it is clear that defense counsel made a tactical decision not to introduce the prison and parole records because they would have informed the jury of Petitioner's criminal history. In any case, it is clear that Petitioner was not prejudiced by the failure of defense counsel to introduce evidence demonstrating that the marks on Petitioner's arm existed at the time of the robbery. Petitioner's arms were uncovered during the Downey Savings and Loan robbery, where he wore a short-sleeved shirt, but were covered during the Citibank robbery. The eyewitnesses to both robberies positively identified Petitioner as the robber, indicating that the marks on his arms played no part in the eyewitness identifications. Moreover, the eyewitness in the Downey Savings and Loan robbery most likely to have seen the

-23-

07cv0791

marks on Petitioner's arms, teller Beverly Hauck, did not testify that Petitioner had no marks on his arms, merely that she did not remember seeing any. (RT 196.)  Although she testified that Petitioner put his arms on the counter, she said she did not believe they were flush on the counter, and it was unclear whether she was in a position to see the marks on his arms. (RT 200.) Moreover, the encounter between Petitioner and Hauck was brief, and Hauck testified that she was terrified, and was so upset she could not even write legibly afterwards. (RT 189, 190.) She identified Petitioner in court as the robber depicted on the security camera videotape, chose his photograph from a photographic lineup about six months after the robbery, and said she was very good with faces and was confident in her identification of Petitioner when she was shown the photographic lineup and in court. (RT 191-94, 196.)  She also gave a description of the robber to the police on the day of the robbery which matched Petitioner's description, and which matched the description of the robber given by witnesses to both robberies. (RT 196.)

In addition to the positive identification of Petitioner by the numerous witnesses to both robberies, the jury was shown the marks on Petitioner's arms and hands at the close of evidence. The trial judge noted, outside the presence of the jury, that marks were visible on the arm of the robber depicted on the security videotape, and although he had not taken a close look at the photographs, it would be for the jury to decide whether the marks were visible and whether they matched the marks on Petitioner's arms. (RT 453, 456.) Defense counsel urged the jury to look closely at the forearms of the robber shown on the security videotape and still photographs and compare them with Petitioner's forearms which they saw in court. (RT 528.)  Counsel also pointed out that even if Petitioner had gained some weight, the robber's forearms were thin, whereas Petitioner had "forearms like Popeye," and that the robber was taller than Petitioner. (RT 529-30.)  Counsel argued that the robber in the photographs had a mark above his elbow, whereas Petitioner's marks were all below the elbow, and that Petitioner had a huge ugly mark on the top of his right forearm which did not show up in the photographs or videotapes. (Id.) The jury requested and were provided with a magnifying glass, which they presumably used to closely inspect the marks on the robber's arm as requested by defense counsel.

///

Thus, the jury was aware that Petitioner had marks on his arms and could see marks on the arms of the robber in the photographs and videotapes, and were asked to compare the two in order to determine if they matched, but there was no issue whether Petitioner had the marks at the time of the robbery.  Petitioner appeared on security camera videotape and photographs from both robberies, eyewitnesses from both robberies accurately described him to police on the day of the robbery, positively identified him in a photographic lineup several months later, and positively identified him in court.  The driver of the getaway car, his co-defendant, admitted his part in the robberies and testified that Petitioner was the robber.  The jury saw the marks on Petitioner's arms and apparently paid close attention to whether they matched the marks on the arms of the robber depicted in the security photographs.  It was objectively reasonable for the appellate court to conclude that it is not reasonably likely that the jury's verdict would have been affected had they been presented with evidence of when Petitioner obtained the marks on his arms, and that the lack of such evidence did not render the result of the trial unreliable.

Petitioner next contends the prosecutor's refusal to stipulate to the date Petitioner obtained the scars violated his right to due process.  (FAP at 6.3-6.4.)  Although the appellate court did not address this claim, it is clearly without merit.  Petitioner provides no basis for a finding of a federal due process violation arising from the prosecutor's refusal to stipulate to evidence which Petitioner was free to introduce through his own testimony or through the prison and parole records which were available to the defense.  The record indicates that Petitioner decided against testifying, even to this limited extent, because he would be impeached by his prior convictions, two of which were robberies.  (RT 464-65.)  In any case, Petitioner was not prejudiced by the prosecutor's refusal to stipulate to the date he obtained the marks on his arm for the same reasons discussed immediately above as to why he was not prejudiced by defense counsel's failure to introduce evidence showing he had the marks on his arms at the time of the robbery.

In the final sub-part of claim one, Petitioner claims that the trial court's rulings regarding the admission of evidence relating to his scars, including the denial of the request for a

1  continuance to obtain medical records, violated his right to due process.  (FAP at 6.1, 6.5-6.7.)

2  The appellate court denied this aspect of claim one, stating:

3          Generally, continuances may only be granted for good cause (§ 1050, subd.
   (e)), and "(e)ntitlement to a midtrial continuance requires the defendant 'show he
4  exercised due diligence in preparing for trial.' (Citation.)" (*People v. Fudge*
   (1994) 7 Cal.4th 1075, 1106.)  "The determination of whether a continuance
5  should be granted rests within the sound discretion of the trial court, although that
   discretion may not be exercised so as to deprive the defendant or his attorney of
6  a reasonable opportunity to prepare.  (Citations.)" (*People v. Sakarais* (2000) 22
   Cal.4th 596, 646.)  When the request for a continuance is made in the midst of a
7  trial, as here, the court in exercising its discretion "'must consider not only the
   benefit which the moving party anticipates but also the likelihood that such benefit
8  will result, the burden on other witnesses, jurors and the court and, above all,
   whether substantial justice will be accomplished or defeated by a granting of the
9  motion.  In the lack of showing of an abuse of discretion or of prejudice to the
   defendant, a denial of his motion for a continuance cannot result in a reversal of
10  a judgment of conviction.' (Citations.)" (*People v. Zapien* (1993) 4 Cal.4th 929,
   972 (*Zapien*), quoting *People v. Laursen* (1972) 8 Cal.3d 192, 204.)

11
          Here, Evans and his trial counsel had had more than a year to prepare his
12  defense of misidentification based partially on the fact the eyewitnesses had not
   observed the scars on Evans's arms and hands.  In presenting such defense,
13  counsel had cross-examined the majority of the prosecution witnesses about
   whether they had observed any scars or tattoos on the man who robbed the banks,
14  had had Wicks describe the marks on Evans's arms for the jury, and at the time of
   the motion for a continuance had already obtained a favorable ruling to show
15  Evans's arms to the jury in the defense case.  During the course of the hearing
   about the marks on Evans's arms and the belated request for a continuance to
16  obtain his medical records, the court had heard counsel's reason for not obtaining
   the records before that time and also had the prosecutor's offer to stipulate to the
17  admission of parole records which showed several of the marks preexisted the
   robberies.  In addition, the court had given Evans an afternoon and overnight to
18  decide whether to testify.

19          Although the court found the issue of the age of the scars potentially
   important, on this record we cannot find it abused its discretion in denying a
20  24-hour continuance before the defense case to obtain Evans's medical records
   from various hospitals, including one located in another county.  Only after the
21  court had conducted several lengthy discussions with the parties did Evans's trial
   counsel ask for the continuance.  At that point, counsel simply had not shown due
22  diligence in obtaining the records despite having had months to prepare for trial
   and having had a half day continuance after the close of the prosecution case.
23  Because trial counsel had already made the tactical decision not to present readily
   available evidence as to the timing of the marks because she did not want the jury
24  to know about Evans's criminal history, and was not foreclosed from arguing the
   marks on Evans's arms which were shown the jury appeared to be old and were
25  not of recent vintage, which counsel had conceded was what she wanted to be able
   to argue, we cannot find substantial justice was defeated by the denial of the
26  continuance for medical records so late in the trial.  Accordingly, Evans has failed
   to show the court abused its discretion in denying the continuance or that he
27  suffered any real prejudice.  (See *Zapien*, *supra*, 4 Cal.4th at p. 972.)

28          Contrary to Evans's selective parsing of the record to claim he was denied
   due process and the right to present a defense, the record shows otherwise.  Evans

1    has neither demonstrated that there is a reasonable probability the outcome of the
2    trial would have been more favorable to him had the continuance been granted, or
     that any of his federal constitutional rights were violated by the court's failure to
     grant the continuance. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 944-945;
3    distinguished on another point in *People v. Lasko* (2000) 23 Cal.4th 101,110.)

4    (Lodgment No. 5, <u>People v. Evans</u>, No. D044423, slip op. at 16-18.)

5         As set forth above, clearly established federal law provides that Petitioner can establish

6    a due process violation arising from the trial court's evidentiary rulings only if he can show that

7    the trial court's rulings were arbitrary or resulted in fundamental unfairness.  The appellate court

8    correctly observed that defense counsel did not use the records available to her at trial to show

9    that the marks on Petitioner's arms pre-dated the robberies because they would have allowed the

10   jury to learn of Petitioner's prior criminal record.  Even assuming evidence could have been

11   procured which did not implicate Petitioner's criminal record, such as medical records, the

12   appellate court was correct that Petitioner was not prejudiced by defense counsel's failure to

13   introduce such records.  For the reasons discussed immediately above regarding why Petitioner

14   was not prejudiced by the lack of evidence regarding when he obtained the marks on his arms,

15   it is clear that he was not prejudiced by the denial of his motion for a continuance in order to

16   procure such records.  The appellate court's determination that Petitioner's trial was not

17   fundamentally unfair as a result of the denial of the motion for a continuance is objectively

18   reasonable.

19        The appellate court's determination that the trial court did not act arbitrarily in denying

20   the defense motion for a continuance is also objectively reasonable.  Defense counsel told the

21   trial judge that they had determined there was no need to introduce evidence regarding the timing

22   of when Petitioner got the marks on his arms because they assumed the jury would know they

23   were old scars.  (RT 463-64.)  When the trial judge stated that the defense could argue that the

24   marks appear to be whatever they reasonably appear to be, defense counsel replied: "That's all

25   I'm asking for."  (RT 465.)  Thus, the appellate court correctly noted that the denial of the

26   continuance did not prevent the defense from arguing that the marks on Petitioner's arm were

27   not visible to the eyewitnesses, and that the marks on the arms of the robber as shown in the

28

1  photographs and videotapes were different than the marks on Petitioner's arms.  The denial of

2  the continuance was not arbitrary and did not result in a fundamentally unfair trial.

3       The Court finds that the adjudication of claim one by the state court was neither contrary

4  to, nor involved an unreasonable application of, clearly established federal law, and was not

5  based on an unreasonable determination of the facts, and recommends denying habeas relief.

6  **C.    Petitioner is not entitled to habeas relief as to claim two.**

7       Petitioner contends in claim two that his right to due process under the Fifth, Sixth and

8  Fourteenth Amendments was violated because insufficient evidence exists to support his

9  convictions. (FAP at 7.1-7.3.) Respondent contends that Petitioner is unable to demonstrate that

10  the adjudication of this claim by the appellate court was contrary to, or an unreasonable

11  application of, clearly established federal law, or that it was based on an unreasonable

12  determination of the facts.  (Ans. Mem. at 16-18.)  Petitioner replies that the appellate court

13  unreasonably found that the force or fear element of robbery was satisfied by evidence of the

14  reactions of the persons who were robbed, without consideration of the robber's conduct.

15  (Traverse at 7-9.)

16       Petitioner presented claim two to the state supreme court in the petition for review.

17  (Lodgment No. 2 at 22-26.)  The petition for review was summarily denied without a statement

18  of reasoning or citation of authority.  (Lodgment No. 7.)  Petitioner presented this claim to the

19  appellate court in the same manner as it was presented to the state supreme court.  (Lodgment

20  No. 3 at 32-36.)  The appellate court denied the claim in a reasoned opinion.  (Lodgment No. 5,

21  People v. Evans, No. D044423, slip op. at 24-27.)

22       The Court will therefore look through the silent denial by the state supreme court to the

23  appellate court opinion.  Ylst, 501 U.S. at 804.  The appellate court stated:

24       Finally, Evans contends his convictions must be reversed because there is
        insufficient evidence to support the element of force or fear in either bank robbery.
25       He specifically argues that because the prosecutor did not claim he used force, and
        neither bank teller victim testified he or she was in fear of an unlawful injury due
26       to his face or voice, the evidence was unsubstantial to show fear based solely on
        his note asking for money.  We disagree.

27       In reviewing the sufficiency of the evidence to support a conviction, we
28       determine "'whether from the evidence, including all reasonable inferences to be
        drawn therefrom, there is any substantial evidence of the existence of each

-28-

element of the offense charged.' (Citations.)" (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13.)  Under such standard, we review the facts adduced at trial in full and in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial direct or circumstantial evidence the defendant committed the charged crime.  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)  The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions.  (*People v. Arcega* (1982) 32 Cal.3d 504, 518; *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 996.)

In making the determination, we do not reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact.  (Evid.Code, § 312.)  We simply consider whether """"any rational trier of fact could have found the essential elements of (the charged offenses) beyond a reasonable doubt."'" (Citations.)" (*People v. Rich* (1988) 45 Cal.3d 1036, 1081.)  Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict" the conviction will not be reversed.  (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.)

With regard to the crime of robbery, section 211 provides that "[r]obbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." CALJIC No. 9.41 provides that "(t)he element of fear in the crime of robbery may be either: (¶) 1. The fear of an unlawful injury to the person or property of the person robbed, or to any of his or her relatives or family members; or (¶) 2. The fear of an immediate and unlawful injury to the person or property of anyone in the company of the person robbed at the time of the robbery." Generally, "the element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his (or her) property." (*People v. Ramos* (1980) 106 Cal.App.3d 591, 601-602, overruled on another point in *People v. Scott* (1994) 9 Cal.4th 331, 353, fn. 16.)  However, where a victim does not expressly testify that he or she was afraid in connection with the taking, there must be some evidence from which a trier of fact can infer the victim was "in fact afraid, and that such fear allowed the crime to be accomplished. (Citations.)"  (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1709, fn. 2.)

Here, the record before the jury, viewed in accordance with the above rules, showed both bank teller victims were in fear while being robbed by Evans.  When Evans approached Tavano's station at Citibank and placed the demand note on the counter, Tavano testified he did what the note said because he was trying to protect Sylvester who was working underneath his station.  Although Tavano did not expressly state he was afraid during the robbery, he conceded he had been in shock because it was the first time he had been robbed in a bank setting.  Sylvester testified Tavano appeared to be scared when he stood trembling with a note in his hand and told her in a crackling voice he had been robbed immediately after Evans left the bank.  From this evidence, a jury could reasonably infer that Tavano was at least in fear for the safety of another and such fear allowed Evans to obtain the money from Tavano which he demanded in his note.

Likewise, the record supports a finding the teller at Downey Savings was also in fear while being robbed by Evans.  Hauck testified Evans leaned into her window with the demand note, with his arms on the counter and his face almost within a foot of hers when he quietly, yet forcefully told her to give him what

money she had even though she did not have enough money in her drawer to give him the $2,500 demanded in his note. Hauck explicitly stated she was panicked to the point of being terrified as she put her drawer with the money on her counter so Evans could take the money and put it in his wallet. Hauck was crying as Evans left the bank. She was so upset that her notes detailing the robbery were illegible and she had still not calmed down nearly two hours later when she went home. A jury could reasonably find from this evidence that Hauck was in fear when she complied with Evans's demand for money.

Because substantial evidence supports the jury's findings Evans used fear to commit both bank robberies, his convictions will not be disturbed.

(Lodgment No. 5, People v. Evans, No. D044423, slip op. at 24-27.)

The clearly established federal law regarding sufficiency of the evidence claims in the criminal context is set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). In Jackson, the Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324. In making this determination, habeas courts must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict. Id. at 319. Once a state court fact finder has found a defendant guilty, federal habeas courts must consider the evidence "in the light most favorable to the prosecution." Id. Federal habeas courts must also analyze Jackson claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16 (emphasis added).

The Ninth Circuit has stated that: "After AEDPA, we apply the standards of Jackson with an additional layer of deference." Juan H. v. Allen, 408 F.3d 1262, 1275 (9th Cir. 2005). In Allen, the Ninth Circuit first reviewed the standard of review applied by the state appellate court to a sufficiency of the evidence claim, and found that although the state court did not cite to the relevant federal case law, "such a citation is not required 'so long as neither the reasoning nor the result of the state-court decision contradicts' Supreme Court precedent." Id. at 1274 n.12, quoting Early v. Packer, 537 U.S. 3, 8 (2002). The state appellate court here applied a standard similar to Jackson and similar to that applied by the state court in Allen (compare id. and

Lodgment No. 5, <u>People v. Evans</u>, No. D044423, slip op. at 24-25), and this Court must similarly determine whether the state appellate court opinion here "reflected an unreasonable application of *Jackson* . . . to the facts of this case." <u>Allen</u>, 408 F.3d at 1275.

Viewing the evidence "in the light most favorable to the prosecution," as this Court must, it is clear that sufficient evidence was adduced at trial to support the force or fear element of robbery under California law. With respect to the Downey Savings and Loan robbery, Beverly Hauck testified that Petitioner handed her a note instructing her to put $2,500 in his wallet without dye packs. (RT 188.) She testified that she was terrified and that she did not calm down for nearly two hours after the robbery. (RT 189-90.) Her supervisor testified that Hauck was crying and shaking, and appeared pale and scared. (RT 110.) A customer, Wells, testified that immediately after the robber left her window, Hauck was crying and was so upset that she could not respond to Wells' inquiry as to what had happened other than to nod her head. (RT 136.) The appellate court's determination that this evidence was sufficient to satisfy the force or fear element of robbery under California law is objectively reasonable. <u>Jackson</u>, 443 U.S. at at 324 n.16 (noting that federal habeas courts must analyze such claims "with explicit reference to the substantive elements of the criminal offense as defined by state law."); <u>People v. Ramos</u>, 106 Cal.App.3d 591, 601-02 (1980) (Holding that "[t]he element of fear for purposes of robbery is satisfied when there is sufficient fear to cause the victim to comply with the unlawful demand for his [or her] property."), <u>overruled on other grounds by</u> <u>People v. Scott</u>, 9 Cal.4th 331, 353 (1994).

With respect to the Citibank robbery, April Sylvester testified that she was cleaning under Marc Tavano's teller window when Petitioner robbed Tavano. (RT 258.) She testified that immediately after the robbery Tavano was scared, flushed, trembling, and shaking, that his voice cracked when he said he had just been robbed, and that it sounded as if he was on the verge of crying. (RT 261.) Nancy Tuininga, an employee at Citibank, was suspicious of Petitioner and stood in line with him while he was at Tavano's window. She testified that under ordinary conditions if she was in a teller's line the teller would look up and ask why she was in line, but on this occasion Tavano kept his head down, refused to make eye contact, was red in the face,

and looked very flushed.  (RT 284.)  The appellate court's determination that this evidence was sufficient to satisfy the force or fear element of robbery under California law is objectively reasonable.  Jackson, 443 U.S. at at 324 n.16; People v. Mungia, 234 Cal.App.3d 1703, 1709 n.2 (holding that even where a victim does not expressly testify that he or she was afraid, evidence from which a trier of fact can infer "that the victim was in fact afraid, and that such fear allowed the crime to be accomplished," is sufficient to satisfy the force or fear element of robbery.)

Petitioner contends that the force or fear element cannot be proven merely through the subjective fear of the person being robbed, but that the robber's conduct must also be considered. (Traverse at 9.)  Petitioner does not support this contention with citation to state law.  In any case, there was evidence that Petitioner's actions were the cause of the fear in the persons who were robbed.  Beverly Hauck testified that when she told Petitioner that she did not have as much money in her drawer as the note demanded, Petitioner said "with force," and "while leaning into my window" about a foot from her face, to "just give it to me."  (RT 188.)  Marc Tavano, the other teller who was robbed, testified that he complied completely with Petitioner's demands because he was afraid for the safety of April Sylvester, who was cleaning under his teller window, in that if she popped up during the robbery it might have startled Petitioner.  (RT 244.)  Thus, unlike Huack's response that she did not have sufficient funds to satisfy the demands of the note, which elicited a threat, Tavano did nothing to elicit a show of force from Petitioner because he was concerned that startling him could incite a violent reaction.

To the extent Petitioner contends the identity element of robbery was not satisfied because the eyewitness identifications were based on impermissibly suggestive police procedures, and therefore insufficient to support the jury's finding that he was the robber, his claim is without merit.  Clearly established federal law provides that, "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside . . . only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968).  Additionally, even when a witness identifies a defendant under suggestive circumstances, clearly established federal law provides that the court should consider the

07cv0791

following five factors to determine whether the identification was nonetheless reliable: "[t]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson v. Brathwaite, 432 U.S. 98, 114 (1977); Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

The witnesses here were afforded an excellent opportunity to view Petitioner during the robberies. He actually spoke to and interacted with Hauck (RT 188), Engblom (RT 222), Tavano (RT 242-43) and Sylvester (RT 258-59). Tuininga and Engblom both testified that they felt something was not right about Petitioner when they saw him looking around the bank while pretending to read to brochures, and in response, Engblom activated heightened security cameras while Tuininga stood in line two feet from Petitioner and stared at him. (RT 224, 281-82.) Rodmel kept an eye on Petitioner while he was in the bank because she also had a bad feeling about him. (RT 151.) Sintay made eye contact with Petitioner while he was in the teller line. (RT 109.) Simpson, Petitioner's co-defendant, drove Petitioner to and from the robberies and identified him as the robber of both banks, and Petitioner's image was captured on security photographs and videotapes which were shown to the jury. All the witnesses gave a physical description of the robber which generally matched Petitioner's physical description.

Thus, although there was a delay of about two months between the robberies and the photographic lineups, the witnesses had a very good opportunity to view Petitioner during the robberies, their degree of attention was high during the robberies, they gave accurate physical descriptions of Petitioner immediately after the robberies, and many were highly certain of their identifications. Thus, even if the six-pack photographic lineup was impermissibly suggestive because the other five persons did not look like Petitioner, Petitioner has not demonstrated that the in-court identifications were unreliable. Manson, 432 U.S. at 114; Biggers, 409 U.S. at 199-200. Moreover, the identity issue was adequately placed before the jury. Defense counsel argued to the jury that the identifications were unreliable because Petitioner was the only person depicted in the photographic lineup who looked like the person who appeared on the security videotape, which the witnesses were shown simultaneously with the first time they were shown

the photographic lineup, thereby suggesting to the witnesses that Petitioner was the robber.  (RT 526-33, 537-40.)  Counsel argued that this suggestion was strengthened the more times the witnesses were shown the photographic lineup and the more times they saw Petitioner in suggestive settings, such as sitting in the defendant's seat in court.  (Id.)  The photographic lineup cards which the witnesses signed during their initial identification were projected on a screen during defense counsel's closing argument, were entered into evidence, and were available to the jury during deliberations.  (RT 296, 526.)  Counsel also argued that the marks on the robber's arms as shown in the security photographs and videotapes were different than the marks on Petitioner's arms, and that the physical appearance of the robber differed from Petitioner in both height and weight.  (RT 528-30.)  Counsel argued that the actual robber was a drug dealer named Chaz who looked very much like Petitioner, and that Simpson was lying in order to protect his drug connection.  (RT 534-35.)  The jury obviously rejected these arguments, apparently doing so in a very conscientious manner by requesting a magnifying glass during deliberations which they likely used to inspect the marks on the robber's arms shown in the security photographs.  Petitioner has failed to show that suggestive identification procedures called into question the accuracy of the eyewitness identifications to a degree that they were rendered unreliable.   In sum, sufficient evidence exists to support the jury's finding that Petitioner was the robber of both banks and that he committed the robberies by use of force or fear as that element is defined by state law.

The Court finds that the adjudication of claim two by the state appellate court was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts.  The Court therefore recommends denying habeas relief as to claim two.

**D.      Petitioner is not entitled to habeas relief as to claim three.**

Petitioner contends in claim three that his rights to due process and equal protection under the Fifth, Sixth and Fourteenth Amendments were violated by: (a) the pre-accusation delay; (b) prosecutorial misconduct in connection to the preliminary hearing which resulted in impermissibly suggestive identification procedures; (c) the failure of the prosecutor to disclose

exculpatory and impeachment evidence; (d) suborning of perjury by the prosecution; (e) conflict of interest by, and ineffective assistance of, defense counsel; (f) the admission of the truth of his prior convictions while Petitioner was mentally incompetent; (g) discriminatory prosecution; and (h) general improprieties and outrageous government conduct during the state proceedings. (FAP at 8.1-8.29.)

Respondent contends that Petitioner has failed to exhaust his state court remedies with respect to claim three, but that habeas relief should be denied notwithstanding the failure to exhaust because the claim is without merit. (Id. at 18-23.) Petitioner replies that he presented claim three to the California Supreme Court in a habeas petition, and it is therefore exhausted. (Traverse at 9.)

Petitioner presented claim three in a habeas petition filed in the state supreme court on April 16, 2007, just prior to filing his federal Petition in this Court on May 1, 2007. (See FAP Ex. 4 at 4.12-4.30.) Petitioner sought a stay immediately upon initiation of his federal habeas proceedings, pending a ruling by the state supreme court. (Doc. No. 3.) The motion for a stay was denied as moot because the California Supreme Court denied the habeas petition while the stay motion was under submission. (See Doc. No. 19.) The state supreme court denied the habeas petition with an order filed September 12, 2007, which stated in full: "The petition for writ of habeas corpus is denied. (See *In re Swain* (1949) 34 Cal.2d 300, 304; *People v. Duvall* (1995) 9 Cal.4th 464, 474.)" (FAP Ex. 1, doc. A.)

Respondent contends that the citations to Swain and Duvall indicate the state supreme court concluded that Petitioner had failed to plead the grounds for relief with sufficient particularity, and had failed to provide factual support for claim three. (Ans. Mem. at 20.) Respondent argues that Petitioner therefore did not properly present claim three to the state's highest court, and it is unexhausted. (Id.) Respondent also argues that state court remedies remain available to Petitioner because he can return to state court and present claim three in a proper manner, that is, with sufficient particularity and with adequate factual support. (Id.)

Petitioner ordinarily is required to properly present his claim to the state's highest court in order to exhaust state court remedies. See Granberry v. Greer, 481 U.S. 129, 133-34 (1987)

(holding that proper exhaustion of state judicial remedies requires a state prisoner to present the California Supreme Court with a fair opportunity to rule on the merits of every federal issue raised in his or her petition).  A federal habeas court ordinarily is required to dismiss petitions which contain unexhausted claims.  See Rose v. Lundy, 455 U.S. 509, 522 (1982) (holding that a federal habeas court must generally dismiss applications for writs of habeas corpus that contain unexhausted claims); but see 28 U.S.C.A. § 2254(b)(2) (West 2006) (providing that federal courts have the discretion to deny a habeas application on the merits notwithstanding a petitioner's failure to fully exhaust state judicial remedies); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1982) (finding that the exhaustion requirement is inapplicable with respect to claims which "clearly do not rise to the level of alleged deprivations of constitutional rights.")

Thus, Respondent is correct that the federal habeas exhaustion requirement ordinarily is satisfied when a petitioner provides "the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his [or her] constitutional claim." Anderson v. Harless, 459 U.S. 4, 6 (1982), quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971). However, the exhaustion requirement may be satisfied notwithstanding a failure to present a claim to the state supreme court, "if it is clear that (the habeas petitioner's) claims are now procedurally barred under (state) law." Gray v. Netherland, 518 U.S. 152, 161 (1996), quoting Castille v. Peoples, 489 U.S. 346, 351 (1989); Engle v. Isaac, 456 U.S. 107, 125-26 n.28 (1982) (noting that the exhaustion requirement applies "only to remedies still available at the time of the federal petition."); Valerio v. Crawford, 306 F.3d 742, 770 (9th Cir. 2002) (same), citing Phillips v. Woodford, 267 F.3d 966, 974 (9th Cir. 2001) ("the district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'").  "A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him." Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) (quoting Coleman v. Thompson, 501 U.S. 722, 732 (1991)).

It appears clear that Petitioner has satisfied the technical requirements of exhaustion with respect to the claim three because he no longer has state court remedies available to him.  He did

not raise this claim on his direct appeal of his conviction, which was affirmed by the state supreme court on February 1, 2006.  Rather, it was presented to the state supreme court in a pro se state post-conviction habeas petition filed on April 16, 2007, over a year after his direct appeal ended.  It therefore appears clear that any attempt by Petitioner to return to state court at this time, over two and one-half years after the conclusion of direct appeal, in order to seek further post-conviction relief for a claim which has already been presented to the state supreme court and denied on the basis of a procedural bar, would meet with the imposition of another procedural bar.  See In re Robbins, 18 Cal.4th 770, 788 n.9 (1998) (In re Clark "serves to notify habeas corpus litigants that we shall apply the successiveness rule when we are faced with a petitioner whose prior petition was filed after the date of finality of Clark."), see also In re Clark, 5 Cal.4th 750, 797-98 (1993) ("the general rule is still that, absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied," and describing the "fundamental miscarriage of justice" exception to that rule which does not apply here).  Moreover, as discussed below, these claims are without merit, and the exhaustion requirement is generally inapplicable to such claims.  See Acosta-Huerta, 7 F.3d at 142 (finding that the exhaustion requirement does not apply to claims which "clearly do not rise to the level of alleged deprivations of constitutional rights.")  The Court therefore recommends rejecting Respondent's argument that claim three is unexhausted, or that state court remedies remain available to Petitioner.

In order to be granted federal habeas relief on a claim which meets the technical requirements of exhaustion in this manner, Petitioner must overcome a procedural default.  See Coleman, 501 U.S. at 735 n.* (holding that a procedural default arises when a petitioner has "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.")  As a precondition to granting habeas relief on such a defaulted claim, Petitioner is required to overcome the default by demonstrating cause for his failure to properly present his claim to the state supreme court, and prejudice as a result of this Court's imposition of a procedural default, or show that a fundamental miscarriage of justice would result if habeas

1   relief was denied as a result of the default.  Id. at 750.  However, this Court has the discretion

2   to deny the claim on the merits without addressing the procedural default issue if to do so would

3   "further the interests of comity, federalism, and judicial efficiency."  Boyd v. Thompson, 147

4   F.3d 1124, 1127 (9th Cir. 1998).  That standard is satisfied here, because, for the following

5   reasons, the Court finds claim three to be without merit.

6           **1)    Pre-accusation delay**

7           Petitioner alleges that his federal Constitutional rights to due process and equal protection

8   were violated by the pre-accusation delay.  (FAP at 8.1-8.6.)  He states that the robberies were

9   committed on February 12 and 15, 2003, that his parole was revoked and he was returned to

10  custody on an unrelated matter on February 24, 2003, but that he was not charged until October

11  8, 2003.  (Id. at 8.1-8.2.)  He contends that the eight-month delay in charging him violates

12  federal due process, and requests an evidentiary hearing in order to develop the record in this

13  regard.  (Id. at 8.3, 8.6.)  He argues that he was prejudiced due to: (a) the inability of witnesses

14  to remember relevant and material evidence; (b) his own inability to account for his whereabouts

15  during the robberies; and (c) the loss or destruction of law enforcement records.  (Id. at 8.2-8.4.)

16          Respondent argues that clearly established United States Supreme Court precedent allows

17  for a pre-accusation investigative delay.  (Ans. Mem. at 22, citing United States v. Lovasco, 431

18  U.S. 783, 796 (1977).)  Because Petitioner has identified no reason for the delay other than

19  investigation, Respondent contends he has failed to allege a due process violation.  (Id.)

20          Clearly established federal law provides that in order for Petitioner to demonstrate a

21  violation of his Fifth Amendment right to due process based on pre-indictment delay, as made

22  applicable to the states through the Fourteenth Amendment, see Ingraham v. Wright, 430 U.S.

23  651, 673 (1977), he must carry a heavy burden to prove actual, non-speculative prejudice to his

24  defense from the delay.  United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir. 1992), citing

25  Lovasco, 431 U.S. at 790; Boyd v. Newland, 467 F.3d 1139, 1152 (9th Cir. 2006) (noting that

26  Ninth Circuit case law may be persuasive authority for determining what is clearly established

27  federal law), cert. denied, 127 S.Ct. 2249 (2007).  If Petitioner demonstrates actual prejudice,

28  the Court must balance the length of the delay against the government's reason for the delay to

1    determine whether the delay "violates those 'fundamental conceptions of justice which lie at the

2    base of our civil and political institutions,' which define 'the community's sense of fair play and

3    decency.'" Lovasco, 431 U.S. at 790 (citations omitted); Huntley, 976 F.3d at 1290.

4         It appears that the delay here was caused by the FBI investigation.  Defense counsel

5    argued that the FBI immediately responded to the robberies, which occurred in February, and

6    gathered forensic evidence at that time, that they put together a six-pack photographic lineup

7    which they showed the witnesses in April, and then decided not to prosecute, due probably,

8    counsel argued, to the equivocal initial identifications by the eyewitnesses.  (RT 536.)  Detective

9    Zamora testified that the FBI turned the case over to the San Diego County Sheriff's Department

10   in October of 2003.  (RT 210.)  Petitioner was charged on October 8, 2003.  (CT 1.)  Defense

11   counsel argued that the record was unclear regarding what took place from April to October,

12   although she implied at one point that some of the photographic lineups were conducted by the

13   FBI as late as July of 2003.  (RT 207, 536-37.)

14        Thus, the FBI apparently took approximately two months, from February to April, to

15   identify Petitioner as the robber from the security photographs and videotapes, which they

16   apparently did by circulating a photograph of the robber to area parole agents (Petitioner's parole

17   agent Wicks identified him and provided Petitioner's booking photograph for the six-pack

18   lineup), then put together a photographic lineup containing his photograph which they showed

19   to the eyewitnesses.  Petitioner has not indicated that such an investigative delay is in any

20   manner unreasonable, and has not shown an improper reason for the delay.  See Lovasco, 431

21   U.S. at 790 ("[P]roof of prejudice is generally a necessary but not sufficient element of a due

22   process claim, and . . . the due process inquiry must consider the reasons for the delay as well

23   as the prejudice to the accused.")  There is nothing in the record to suggest that the six-month

24   delay between when the FBI obtained eyewitness identifications and when the case was turned

25   over to the San Diego Sheriff's Department, which immediately charged Petitioner, was due to

26   anything other than the investigation of the robberies, review of the evidence, and preparation

27   for prosecution.  Moreover, there are no facts or law indicating that such a six-month delay is

28   unreasonable.

Even if Petitioner could establish an improper reason for the delay, he has failed to make the required showing of non-speculative prejudice. He alleges that he was prejudiced by the inability of the eyewitnesses to remember relevant and material evidence. (FAP at 8.3.) However, in support of this argument, he merely provides citations to the trial transcript regarding the witnesses' inability to remember the exact date they were shown a photographic lineup (id. at 8.3, citing RT 137, 212), the exact date they spoke to a detective before coming to court (id., citing RT 156), and Petitioner's precise appearance and clothing worn during the robbery (id., citing RT 164-65, 233-34), and containing their comments that Petitioner had gained weight and shaved his mustache since the robbery (id., citing RT 138-39, 155, 200, 254) and that they were unable to recognize Petitioner at the preliminary hearing due to seeing only the back of his head (id. citing RT 143), and a statement made by one witness to a detective (id. at 212-16). There is no prejudice apparent to Petitioner arising from any of this testimony and Petitioner has failed to carry his "heavy burden" of identifying non-speculative prejudice arising from the delay. Lovasco, 431 U.S. at 790.

Petitioner also alleges that he was prejudiced because he was unable to remember where he was at the time of the robberies, and because certain law enforcement records were lost or destroyed during the delay. (FAP at 8.3-8.4.) There is no indication how Petitioner was prejudiced by his inability to remember where he was, particularly in light of the fact that he did not testify at trial, and the fact that he was positively identified by numerous witnesses, including his co-defendant, as being the person who was in the banks robbing them at the time of the crimes. He was taken into custody shortly after the robberies on an unrelated matter and held in custody until trial, further weakening his contention that he was unable to remember his whereabouts during the final days of his non-custodial status. His contention that law enforcement records were lost or destroyed, or that he was prejudiced by their unavailability, is based on pure speculation. (FAP at 8.8.3-8.4.) Moreover, the majority of the witnesses were able to positively identify Petitioner in court as the robber, the jury was provided with security photographs and videotapes of the robberies showing the robber, and Petitioner was able to argue to the jury that the passage of time affected the eyewitness identifications. Petitioner has

1  failed to establish an unreasonable delay or any prejudice resulting from the delay, and the pre-

2  charging delay aspect of claim three is without merit.

3  **2)  Prosecutorial misconduct**

4  Petitioner contends that his rights under the Fifth, Sixth and Fourteenth Amendments

5  were violated by prosecutorial misconduct which resulted in an unfair preliminary hearing.

6  (FAP at 8.6-8.10.)  He contends the manner in which the preliminary hearing was conducted,

7  having the trial witnesses come forth, enter their names in the record and be ordered to return

8  later, amounted to an impermissibly suggestive courtroom show-up identification.  (Id. at 8.7.)

9  Petitioner points to the testimony of April Sylvester, who testified at trial that immediately after

10 the preliminary hearing the prosecutor took each witness aside outside the presence of the other

11 witnesses and asked them if they were certain that the man in the courtroom sitting at the defense

12 table, Petitioner, was the robber.  (RT 265-66.)

13 Respondent contends that Petitioner has presented only conclusory allegations to support

14 this claim, which are insufficient to provide federal habeas relief, and that even if the

15 prosecutor's actions had some impact on the eyewitness identifications, the defense was free to

16 argue that fact to the jury.  (Ans. Mem. at 22-23.)

17 Clearly established federal law provides that "[t]o constitute a due process violation, the

18 prosecutorial misconduct must be 'of sufficient significance to result in the denial of the

19 defendant's right to a fair trial.'"  Greer v. Miller, 483 U.S. 756, 765 (1987) (quoting United

20 States v. Bagley, 473 U.S. 667, 676 (1985)).  The misconduct must be reviewed in the context

21 of the entire trial.  Donnelly v. DeChristoforo, 416 U.S. 637, 639-43 (1974).

22 As discussed above with respect to claim two, Petitioner has failed to demonstrate that

23 the in-court identifications in this case were tainted by unduly suggestive police procedures.  As

24 set forth above, the witnesses all gave descriptions to the police on the day of the robbery which

25 generally matched Petitioner's physical description.  The identifications were not affected by the

26 manner in which the preliminary hearing was conducted because nearly all of the witnesses

27 testified that they were not able to get a good look at Petitioner during the preliminary hearing,

28 but merely saw the back of his head or the side of his face.  In any case, an in-court identification

is permissible "as long as the witness has an independent recollection that is wholly untainted by police misconduct." United States v. Burdeau, 168 F.3d 352, 358 (9th Cir. 1999). Several witnesses positively identified Petitioner in court as the robber, and the jury was able to see the photographic lineups, hear testimony regarding how they were conducted, and judge for themselves whether the procedure was impermissibly suggestive or had any effect on the in-court identifications. The jurors also were provided with the security camera photographs as well as the videotape taken during the robberies and were allowed to determine for themselves if Petitioner was the robber. Petitioner has failed to demonstrate misconduct by the prosecutor in relation to the manner in which the preliminary hearing was conducted.

### 3) Failure to disclose evidence/suborning of perjury

Petitioner contends the prosecutor withheld or suppressed evidence in violation of the Fifth and Fourteenth Amendments, as interpreted in Brady v. Maryland, 373 U.S. 83, 87 (1963), and suborned perjury in violation of his right to due process under the Fourteenth Amendment. (FAP at 8.10-8.20.) He contends the prosecution: (a) failed to turn over police reports relating to his co-defendant, Richard Simpson, and suborned perjury from Simpson; (b) failed to disclose notes written by Beverly Hauck; and (c) failed to disclose that Parole Agent Wicks provided the FBI with Petitioner's mug shot for the six-pack photographic lineup. (Id.)

Respondent contends that Petitioner has provided nothing but his own self-serving allegations to suggest that any of the evidence referred to exists, is material, was not in the possession of the defense at trial, and/or was not utilized at trial for strategic reasons. (Ans. Mem. at 23.)

Clearly established federal law provides that in order to prove a Brady violation, a petitioner must show that: "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment." Paradis v. Arave, 130 F.3d 385, 392 (9th Cir. 1997). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting Bagley, 473 U.S. at 682).

Petitioner contends that police reports which could have been used to impeach his co-defendant Simpson were withheld from the defense. (FAP at 8.10-11.) Simpson was impeached at trial not only by his admission to knowingly taking part in at least one of the robberies and accepting money for his role in both robberies, but by his prior felony convictions for possession of amphetamine with intent to distribute and reckless evading arrest, and his admission that he had violated probation more than once. (RT 180.) Simpson also admitted to having a drug problem, and defense counsel argued to the jury that he was a liar who was testifying falsely to minimize his participation in the robberies, reduce his own sentence, and protect his drug source. (RT 183, 534-35.)

Petitioner contends, based purely on speculation, that further impeachment with information that Simpson asked a person named Louise Silva to assist him in lying, and that the FBI knew that Simpson had other aliases, would have helped his defense. (FAP at 8.11, 8.14.) Petitioner speculates that he could have cross-examined Simpson on his background and history of dealings with law enforcement more effectively if he had this information, or that he could have shown that Simpson was a jail-house snitch and that Petitioner's arrest was a set-up. (Id. at 8.14, 8.16.) Petitioner also contends that the prosecution failed to produce evidence that police reports initially reported the vehicle involved in the robberies as a red BMW rather than a White Honda. (FAP at 8.12.) Even assuming such reports existed, there is no reasonable probability that the jury verdict would have been affected by the admission of such evidence. Kyles, 514 U.S. at 433-34. Petitioner also alleges the prosecutor withheld information regarding a "deal" with Simpson. (FAP at 8.16.) This allegation is based entirely on speculation, without any factual support, and therefore does not provide a basis for habeas relief. James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

Petitioner also contends that the prosecutor erred by failing to turn over the illegible notes written by Beverly Hauck. Even if the notes were not turned over, Petitioner's constitutional argument is without merit because Hauck testified at trial about the notes, the events surrounding their creation, and that there were illegible because she was so scared by the robbery. (RT 190.) The same is true regarding Petitioner's contention that the prosecution failed

to disclose that Parole Agent Wicks gave the FBI Petitioner's mug shot to be used in the photographic lineup.  (FAP at 8.19.)  Petitioner contends that Wicks had a motive to identify Petitioner as the robber because Petitioner had filed a grievance which had gotten Wicks into "quite a deep stink" with high ranking state and federal officials.  (Id. at 8.20.)  However, defense counsel worked hard to prevent the jury hearing that Wicks was Petitioner's parole officer.  Evidence that Wicks was able to identify Petitioner as the robber and provide the FBI with his mug shot because he was familiar with Petitioner in connection to being his parole officer, or any other evidence bringing this relationship out to the jury, would have been harmful to the defense.

Petitioner contends the prosecutor suborned perjury when he allowed Simpson to testify that Petitioner lived with Simpson for a while, when the prosecutor knew that Simpson was a transient with no lease, rental agreement or ownership of any apartment, condominium, house or other dwelling.  (FAP at 8.14.-8.15.)  Petitioner also contends the prosecutor allowed Simpson to testify that he had known Petitioner for a year at the time of the robberies, even though Petitioner had only been released on parole two months before the robberies after serving a five-year prison sentence.  (Id. at 8.15.)  This information, even if true, was well within Petitioner's knowledge at trial.  In any case, the defense was free to impeach Simpson on these points but obviously made a tactical decision to avoid referencing Petitioner's custodial status.  The prosecutorial aspect of claim three is without merit.

**4)   Conflict of interest by, and ineffective assistance of, defense counsel**

Petitioner contends his trial counsel rendered ineffective assistance and acted under a conflict of interest in violation of the Fifth, Sixth and Fourteenth Amendments when she failed to: (a) adequately investigate meritorious defenses; (b) pursue and develop trial and pre-trial motions; (c) preserve potentially dispositive issues by failing to object or objecting on improper grounds; (d) present any substantial mitigating evidence or witnesses during penalty phase of trial; and (e) object to the unfair stipulations regarding fingerprints, handwriting analysis and photographs.  (FAP at 8.20-8.21.)  Respondent contends that Petitioner has presented only a

1   cursory challenge to his conviction with respect to these allegations, which amounts to a

2   "shotgun pleading" inadequate to provide for habeas relief.  (Ans. Mem. at 23.)

3          As set forth above with respect to claim one, for ineffective assistance of counsel to

4   provide a basis for habeas relief, Petitioner must demonstrate that counsel's performance was

5   deficient and that he was prejudiced as a result of the deficient performance.  Strickland, 466

6   U.S. at 687.  "This requires showing that counsel made errors so serious that counsel was not

7   functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that

8   counsel's errors were so serious they deprived Petitioner "of a fair trial, a trial whose result is

9   reliable."  Id.  To satisfy the prejudice prong, Petitioner need only demonstrate a reasonable

10  probability that the result of the proceeding would have been different absent the error.

11  Williams, 529 U.S. at 406; Strickland, 466 U.S. at 694.  The prejudice inquiry is to be considered

12  in light of the strength of the prosecution's case.  Luna, 306 F.3d at 966.

13         Petitioner's claims regarding defense counsel's failure to adequately investigate

14  meritorious defenses is entirely speculative and conclusory, as are his allegations of failure to

15  pursue motions, present evidence and preserve issues for appeal.  (FAP at 8.20-8.21.)  With

16  respect to the stipulation regarding fingerprints, counsel stipulated that law enforcement

17  personnel lifted five fingerprints from the west door of Downey Savings and Loan, two of which

18  were of sufficient quality to compare to Petitioner's fingerprints, and that neither belonged to

19  Petitioner. (RT 295.)  Petitioner does not indicate how he was prejudiced by this stipulation, or

20  why counsel was deficient for entering into the stipulation.  The same is true regarding

21  stipulating to the admissibility or authenticity of the security camera photographs or the still

22  photographs made from the videotapes.  With respect to failing to conduct handwriting analysis

23  on the note Petitioner used in the robberies, Petitioner has not demonstrated prejudice.  Detective

24  Zamora testified that no handwriting analysis was conducted on the note recovered from the

25  Citibank robbery.  (RT 208.)  Even if it was possible to show that the note was not written by

26  Petitioner, there is very little exculpatory value in such evidence in light of the fact that

27  Petitioner was observed by eyewitnesses and caught on videotape handing the note to the teller.

28

1   Such a claim is without merit when considered in light of the extremely strong evidence

2   implicating Petitioner as the person who used the note to rob the bank.

3       Finally, Petitioner contends that his defense counsel was acting under a conflict of

4   interest. (FAP at 8.20, 8.22-23.)  Again, this allegation is based entirely on speculation, without

5   supporting facts, and does not provide a basis for habeas relief.  James, 24 F.3d at 26.

6       **5)      Incompetence to admit prior conviction allegations**

7       Petitioner contends that he was incompetent to admit the truth of the prior conviction and

8   prior prison term sentence enhancement allegations, and that his admission therefore violated

9   his rights under the Fifth, Sixth and Fourteenth Amendments. (FAP at 8.22-8.25.)  He contends

10  he was taking psychotropic medication to treat depression at the time of the admission, that he

11  was improperly induced into the admission, was laboring under the mistaken belief that he would

12  be exposed only to eleven years in prison, and was sentenced to successive sentences for the

13  same transaction or occurrence. (Id.)  Respondent contends that Petitioner has presented only

14  a cursory challenge to his conviction with respect to these allegations, which amounts to a

15  "shotgun pleading" inadequate to provide for habeas relief. (Ans. Mem. at 23.)

16      The record indicates that when Petitioner admitted the truth of the sentence enhancement

17  allegations, the trial judge informed him that, if he was found guilty, he would be exposed to a

18  sentence as high as 62 years-to-life in prison. (RT 566-67.)  Petitioner indicated that he had no

19  questions about the trial judge's explanation of the sentencing consequences of his admission.

20  (RT 567, 571.)  Petitioner indicated that he understood all the constitutional rights he was

21  waiving by admitting the truth of the allegations. (RT 568-71.)  He initialed the box on the

22  change of plea form, which he also signed, indicating that he was sober, his judgment was not

23  impaired, and that he had not consumed any drugs within the past 24 hours. (CT 169.)  The form

24  also included a warning that he faced a possible prison term of 62 years-to-life. (CT 170-71.)

25  Petitioner's conclusory and unsupported allegations that he did not understand the consequences

26  of his admission are insufficient to merit habeas relief.  James, 24 F.3d at 26.

27      To the extent the allegation that his rights were violated because he was sentenced to

28  successive sentences for the same transaction is to be construed as an Eighth Amendment

challenge to his sentence, it is without merit.  Lockyer v. Andrade, 538 U.S. 63, 66-68 (2003) (upholding California's Three Strikes law against an Eighth Amendment challenge); Ewing v. California, 538 U.S. 11, 17-19 (2003) (same).  The same is true to the extent Petitioner is presenting a Fifth Amendment double jeopardy claim.  See Witte v. United States, 515 U.S. 389, 400 (1995) ("In repeatedly upholding such recidivism statutes, we have rejected double jeopardy challenges because the enhanced punishment imposed for the later offense 'is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes,' but instead as a 'stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one.'").

**6)   Discriminatory prosecution**

Petitioner contends he was subject to discriminatory prosecution in violation of his right to equal protection under the Fourteenth Amendment, evidence of which he could develop if he were allowed to conduct discovery or be provided with an evidentiary hearing.  (FAP at 8.25-8.26.)  Respondent contends that this amounts to a cursory challenge which is inadequate to provide for habeas relief.  (Ans. Mem. at 23.)

Clearly established federal law provides that in order to prevail on a discriminatory prosecution claim, a defendant must show a prosecutorial policy which had a discriminatory effect and was motivated by a discriminatory purpose.  United States v. Armstrong, 517 U.S. 456, 464 (1996) (holding that one of the constraints upon prosecutorial discretion "imposed by the equal protection component of the Due Process Clause of the Fifth Amendment . . . is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'"), quoting Oyler v. Boles, 368 U.S. 448, 456 (1962).  However, a defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose."  McCleskey v. Kemp, 481 U.S. 279, 292 (1987) (emphasis in original).

Petitioner has not satisfied this standard, or even attempted to do so.  He merely contends, as he did in state court, that the identification procedures were unfair because the first time the eyewitnesses were able to see a suspect in person was in court during the preliminary hearing, and Petitioner was the only African-American person in the courtroom at that time.  (RT 538.)

1   His contention that his prosecution was motivated by a discriminatory purpose is entirely

2   conclusory and without merit.

3           **7)       General improprieties and outrageous government conduct**

4           Finally, Petitioner contends that the government's conduct in relation to his prosecution

5   was so outrageous, and involved so many improprieties, that it amounted to a due process

6   violation.  (FAP at 8.26-8.29.)  He contends that the government prevented the trial court from

7   learning that he: (a) had joined the United States Marine Corps at the age of 15, became an

8   alcoholic and a "pill-head" in Vietnam at the age of 16, and was decorated while in the Marine

9   Corps; (b) was gainfully employed and paid taxes his entire adult life, other than when he was

10  incarcerated, but even then he was employed; (c) had earned an Associate of Arts degree and a

11  Bachelor of Arts degree, was a business owner, had a business license and was gainfully

12  employed at the time of his arrest; and (c) had an advantageous upbringing in Chicago, Illinois,

13  which included a brother who played linebacker for the Philadelphia Eagles for nine years, and

14  a sister who has owned a beauty salon in Scottsdale, Arizona for twenty-two years. (Id. at 8.27-

15  8.28.)   Respondent contends that Petitioner has presented only a cursory challenge to his

16  conviction with respect to these allegations, inadequate to provide for habeas relief. (Ans. Mem.

17  at 23.)

18          Petitioner has not shown any government action which prevented him from informing the

19  trial court of any or all of these items.  Petitioner was granted the right of elocution and declined

20  to make a statement to the trial judge before sentencing.  (RT 658-59.)  This aspect of claim

21  three is without merit.

22          The Court finds that Petitioner has satisfied the technical requirements of exhaustion of

23  state court remedies with respect to claim three, that the claim is procedurally defaulted, and

24  recommends denying habeas relief on the basis that the claim is without merit.  Alternately, to

25  the extent the claim is unexhausted, the Court recommends denying habeas relief

26  notwithstanding the failure to exhaust because it is without merit.

27  ///

28  ///

# VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **November 24, 2008** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **December 15, 2008** .  The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  November 3, 2008

BARBARA L. MAJOR
United States Magistrate Judge

CC:          HON. JEFFREY T. MILLER
             ALL PARTIES

07cv0791